IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| William F. Shunkwiler,        ) | Civil Action No. 6:07-921-TLW-WMC |
|             Plaintiff,    ) | |
|                    ) | **REPORT OF MAGISTRATE JUDGE** |
|       vs.               ) | |
|                    ) | |
| Michael J. Astrue,         ) | |
| Commissioner of Social Security,   ) | |
|                    ) | |
|             Defendant.   ) | |
| _____ ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits on June 3, 2003, alleging that he became unable to work on May 5, 2001. The application was denied initially and on reconsideration by the Social Security Administration. On May 18, 2004, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, and his mother appeared on August 10, 2005, considered the case *de novo*, and on November 29, 2005, found that the plaintiff was not under a disability as defined in the

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 2, 2007.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)     The claimant's degenerative disc disease is considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c). The claimant's depression, only when combined with his substance abuse, is considered "severe" within the meaning of the Regulations.

(4)     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

(6)     Due to his substance abuse, and subsequent severe depression due to this abuse, the claimant lacks the mental capacity to work.

(7)      When the claimant abstains from substance abuse, he has the residual functional capacity of: light work, or work which involves occasionally lifting and/or carrying a maximum of 20 pounds; frequently lifting and/or carrying up to 10 pounds; and walking or standing six hours a day, or which requires sitting most of the time, but entailing pushing and/or pulling of arm and/or leg controls.

(8)     When the claimant abstains from substance abuse, his past relevant work as a general hardware salesperson and as an automobile salesperson does not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

2

(9)     When the claimant abstains from substance abuse, his medically determinable impairments do not prevent him from performing his past relevant work, as generally performed in the national economy.

(10)     Substance abuse is a contributing and material factor in a decision that the claimant is disabled.

(11)     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled

3

at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 40 years old as of his alleged onset date, and 45 years old on the date of the ALJ's decision (Tr. 33, 35, 54, 470). He has a high school education (Tr. 93, 471) and past relevant work as a general hardware salesperson and automobile salesperson (Tr. 64-71, 81-85, 87, 119).

### *Medical Evidence Dated Prior to May 5, 2001*

The medical evidence showed that police took the plaintiff to the emergency room on December 9, 1998, secondary to agitated and threatening behavior. Dr. John DeWitt noted that the plaintiff was extremely paranoid, gave very little history, was extremely vague and guarded, and was bizarre in his affect and manner. Dr. DeWitt diagnosed bipolar disorder, type I with manic psychosis, rule out paranoid schizophrenia with acute psychotic break. He assigned the plaintiff a GAF score of 20-30 and admitted him to the hospital (Tr. 123-24, 131-32).[2] Dr. DeWitt treated the plaintiff with Risperdal (an anti-psychotic) and Depakote (an anti-convulsant), after which he was much less paranoid, no longer manic, and was oriented, not psychotic. On December 16, 1998, Dr. DeWitt

---

[2]The GAF (Global Assessment of Functioning) considers psychological, social, and occupational functioning on a hypothetical continuum of mental health or illness. A score of 21-30 indicates that "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *Diagnostic & Statistical Manual of Mental Disorders-Text Revision* (*DSM-IV-TR*) (2000) (Stat!Ref Library CD-ROM, First Quarter 2008).

discharged the plaintiff from the hospital, at which time he diagnosed bipolar disorder, manic, with psychotic symptoms.  He assigned the plaintiff a GAF score of 95[3] and prescribed Risperdal, Depakote, Ambien (a sleep aid), and Antivert (medication for vertigo) (Tr. 123-24).

On February 4, 2000, a cervical spine MRI study showed a large left paracentral disc bulge at C4-5 which had mass effect upon the cervical cord, effacing the left lateral recess and narrowing the left neural foramen.  It also showed mild diffuse disc bulges at C5-6 and C6-7, as well as degenerative disc space narrowing and osteophyte formation at C6-7, causing mild neural foraminal narrowing at both of these levels (Tr. 243).

On May 30, 2000, the plaintiff presented to the emergency room with complaints of numbness and tingling in his upper extremities after unloading some heavy cement bags into a dumpster.  A cervical spine x-ray showed moderate spondylosis at C6-7 with moderate space narrowing and no fracture injury.  Dr. Robert Mearns noted that the plaintiff's affect was inconsistent with his physical complaints and his overall demeanor suggested secondary gain as his primary reason for being there.  He noted that the plaintiff's questions were repetitive regarding his management, need for follow-up and concern for his lawyers being aware of his circumstances.  He noted that the plaintiff was very obstreperous and did not cooperate well with the exam, although when he was not in the room asking the plaintiff various testing activities as part of his exam, the plaintiff moved very easily and used all extremities without any evidence of weakness.  He also used his muscle groups quite extensively to keep himself upright, although trying to appear to be weak and falling.  Dr. Mearns offered the plaintiff overnight observation, which he refused. He noted that the plaintiff rapidly claimed improvement and at the time of discharge refused a wheelchair to go to his cab.  He also refused prescription medications and was upset by

------

[3]A GAF score of 91-100 indicates "superior functioning in a wide range of activities" and no mental symptoms. *Id.*

the fact that Dr. Mearns did not order a urine drug screen.  He was ambulatory with continued use of all muscle groups on his way out, although attempting to appear as though he would fall or pass out.  Dr. Mearns diagnosed cervical strain and herniated nucleus pulposus by history (Tr. 219-22).

On August 12, 2000, the plaintiff was admitted to Morris Alcohol and Drug Addiction Treatment Center for crack cocaine dependence.  He reported using up to $800 worth of crack per week.  Dr. J. Gilbert Freeman noted that the plaintiff "appear[ed] to have some Rx medication abuse" and was somewhat vague about the injury for which he took pain medications.  He noted that, during his treatment course, the plaintiff slept during classes, was somewhat disagreeable with the staff, and was agitated with the behavior of other patients.  Dr. Freeman noted that the plaintiff demanded early discharge.  At discharge, Dr. Freeman diagnosed crack cocaine dependence and polysubstance abuse and assigned a GAF score of 40[4] (Tr. 144-47).

On September 27, 2000, the plaintiff saw Dr. W. Daniel Westerkam for an independent medical examination associated with a claim for workers' compensation.  Dr. Westerkam noted that the plaintiff had a history of being struck by a stack of doors in April 1999 while working at Lowes, after which he developed significant neck and back pain.  Dr. Westerkam diagnosed status post-neck injury.  He noted that the plaintiff underwent a lengthy, four-hour work capacities evaluation.  He noted that, while the plaintiff demonstrated an inability to perform cervical flexion during musculoskeletal testing and ladder climbing, he demonstrated continued cervical flexion during completion of paperwork.  Dr. Westerkam found that, although the plaintiff gave inconsistent effort during his evaluation, he could perform light work (Tr. 249-53).

---

[4]A GAF score of 31-40 indicates some impairment in reality or communication or major impairment in several areas such as work, school, family relations, judgment, thinking, or mood. *Id.*

In November 2000, Dr. Westerkam found that the plaintiff was at maximum medical improvement and assigned a five percent whole person impairment rating. He said that the plaintiff could perform light duty work with occasional bending, twisting of the neck, twisting of the waist, climbing, crouching, squatting, kneeling, standing and walking (Tr. 248).

On April 24, 2001, the plaintiff presented to Dr. William Fravel for complaints of neck pain. Dr. Fravel diagnosed neck pain and stated that the plaintiff was "overstating his symptomology." He prescribed anti-inflammatory medications. Five days later, the plaintiff saw Dr. Fravel and reported improvement in his pain (Tr. 235).

**Medical Evidence Dated After May 5, 2001**

The plaintiff returned to Dr. Fravel on May 7, 2001, for complaints of neck and back pain. Dr. Fravel diagnosed chronic back pain and prescribed Celebrex (an anti-inflammatory) (Tr. 235).

On May 21, 2001, the plaintiff saw Dr. Iva Chapple, a pain management specialist, with complaints of neck, upper back, and left arm pain and decreased function. Dr. Chapple found that he had positive tender points in his neck and normal gait. She diagnosed left cervical radiculitis and myofascial upper back and neck pain and prescribed OxyContin (a narcotic), Neurontin (an anti-convulsant), and Baclofen (an anti-inflammatory) (Tr. 398-99).

On June 18, 2001, the plaintiff revisited Dr. Chapple, whose findings did not change from her previous treatment note. She continued the plaintiff's medications (Tr. 396-97).

On June 27, 2001, the plaintiff presented to the emergency room with complaints that he was hit by a car. He reported pain in his scapular and upper thoracic regions. Dr. Andrew Donato found that the plaintiff held his right arm in adduction. He

8

found that the plaintiff refused to go through several ranges of motion, but when he moved himself about on the stretcher, he appeared to have quite normal motor function.  He found that the plaintiff's back was tender to palpation throughout both scapular regions and that he had no specific thoracic or lumbar midline tenderness.  The plaintiff had no soft tissue changes, ecchymosis, soft tissue swelling or abrasions.  Dr. Donato noted that there was nothing objective to verify the plaintiff's stated mechanism of injury.  He further noted that, on examination, The plaintiff jumped forward and called out in pain during palpation in certain areas along the scapular region but, when distracted and palpated with equal force in those same areas, he had absolutely no discomfort.  He stated that there were no objective findings to substantiate the plaintiff's stated level of pain and that, while the plaintiff would not move his neck through much range of motion during formal testing, at other times, he moved his neck around completely freely with no restriction in his movement.  The plaintiff kept his eyes tightly closed and had a very strange demeanor.  Dr. Donato stated that he believed fairly strongly that there was no true injury, and the plaintiff's presentation was completely related to secondary gain.  He diagnosed scapular back pain of uncertain etiology, most probably due to some element of secondary gain or malingering (Tr. 213-14).

On July 5, 2001, Dr. Marianna Maldonado, a psychiatrist, saw the plaintiff for a medication check.  Dr. Maldonado prescribed Xanax (an anti-anxiety medication) (Tr. 266).

On July 16, 2001, the plaintiff saw Dr. Chapple, who diagnosed cervical radiculitis and continued the plaintiff's medications (Tr. 394-95).

On July 17, 2001, the plaintiff saw Dr. Fravel, who noted that he was "over animated."  He said that, even though he asked the plaintiff not to, he stood up and appeared shaky with a careful gait, looking like he was weak and ready to fall.  However, when he went to sit back down and was distracted, he did so easily, using the muscles in

his legs. Dr. Fravel diagnosed neck pain, without a definable anatomic cause, possibly psychosomatic (Tr. 234).

On July 19, 2001, the plaintiff presented to Dr. Steven Poletti for evaluation of his neck and bilateral arm pain. Dr. Poletti found that the plaintiff had a positive L'Hermitte's test, positive hand myelopathy test on the left, intact reflexes, and otherwise normal strength and sensation with the exception of relative dysesthesia in both hands. Dr. Poletti diagnosed cervical disc disruption and possible myelopathy and recommended an MRI study (Tr. 185), which showed C4-5 large left paracentral disc herniation, causing considerable mass effect upon the cervical cord and effacing the left lateral recess, and a smaller C5-6 left paracentral disc herniation with mass effect upon the cervical cord and effacement of the left lateral recess (Tr. 393).

On August 2, 2001, Dr. Poletti found that the plaintiff had a somewhat unusual affect with high pain medication causing somnolence. He recommended that the plaintiff consider a three-level discectomy and interbody fusion as a salvage procedure due to cord compression and questionable hand myelopathy signs with worsening of his discs (Tr. 184).

On August 13, 2001, the plaintiff again saw Dr. Chapple, whose findings were the same as those in her previous note. She continued the plaintiff's medications (Tr. 391-92).

On August 27, 2001, the plaintiff underwent anterior cervical discectomy, C5-6 and C6-7, anterior cervical plating, C4-7, and shaping of the structural allograft (Tr. 167-70).

On September 7, 2001, the plaintiff saw Dr. Poletti for follow-up. He noted that the plaintiff was ambulating well and x-rays showed good position of the interbody bone and plate (Tr. 183). On September 28, 2001, Dr. Poletti found that the plaintiff was doing reasonably well, ambulating better, and was improving (Tr. 182).

The plaintiff returned to Dr. Maldonado on October 1, 2001, for a medication check (Tr. 266).

On October 9, 2001, Dr. Fravel treated the plaintiff for neck pain with Vioxx (an anti-inflammatory) and Depo-Medrol (Tr. 234).

On October 15, 2001, Dr. Maldonado saw the plaintiff, noting that he was very anxious and panicky.  She increased his Xanax (Tr. 269).

On October 26, 2001, the plaintiff returned to Dr. Poletti for follow-up.  Dr. Poletti found that he was "doing remarkably well."  He stated that the plaintiff's fusion was solid.  He recommended physical therapy and follow-up in two months' time, and anticipated that the plaintiff could return to sedentary work.  He prescribed Percocet (a narcotic) (Tr. 181).

On December 21, 2001, the plaintiff returned to Dr. Poletti, reporting that he was assaulted and had neck pain.  Dr. Poletti noted that x-rays showed a "very good" fusion mass at C5-6, and consolidated fusion at C6-7 and C3-4.  He recommended observation and prescribed muscle relaxant medication (Tr. 180).

The plaintiff saw Dr. Maldonado again on January 8, 2002, for a medication check.  Dr. Maldonado continued his Xanax (Tr. 269.)

On January 25, 2002, the plaintiff saw Dr. Fravel, who found that he was fairly anxious appearing and had normal reflexes and decreased rotation in his neck.  He diagnosed neck pain and prescribed OxyContin (Tr. 233).

On February 1, 2002, Dr. Fravel refilled the plaintiff's OxyContin (Tr. 233).  On February 7, 2002, Dr. Fravel prescribed Darvocet (an analgesic), Neurontin, and Ambien (Tr. 232).

On February 12, 2002, the plaintiff was hospitalized following complaints of worsening depression, chronic pain, insomnia, poor appetite, hopelessness, wanting to die, agitation and anger.  Dr. William Walkup found that the plaintiff was well-developed, well-nourished, and in no acute distress.  He found that the plaintiff had good grooming, pressured speech, distractibility, tangential rambling and irritable affect.  He noted that the

plaintiff had vague paranoid ideation and denied hallucinations.  He also noted that the plaintiff's intellectual functioning was average and that he was alert and oriented times four. He diagnosed bipolar disorder and possible polysubstance abuse versus dependence.  He assigned the plaintiff a GAF score of 40.  Dr. Walkup treated the plaintiff with Depakote, afer which he became more calm, cooperative, and pleasant.  He stated that he was contacted by a detective, who said that the plaintiff had pending charges of kidnaping and assault and battery with intent to kill.  The plaintiff said that he knew about the charges, but denied them.  He denied that he came to the hospital to escape the charges, but Dr. Walkup was somewhat suspicious of this.  A consultation indicated opiate addiction, but the plaintiff was unwilling to undergo detox and resisted signing consent forms to obtain medical records from his other physicians.  Dr. Walkup noted that the plaintiff's mood eventually stabilized, his suicidal ideation resolved, he was no longer manic, and he was pleasant and cooperative.  On February 20, 2002, Dr. Walkup diagnosed bipolar disorder, opiate abuse versus dependence, and anti-social personality disorder and prescribed Depakote, Neurontin and Celebrex.  He refused to prescribe OxyContin due to the plaintiff's opiate dependence (Tr. 149-57, 162-64).

On March 20, 2002, the plaintiff presented to the emergency room with complaints of neck pain and left-sided numbness.  Dr. Joseph Sobel found that the plaintiff was well-developed, well-nourished and nontoxic with mildly histrionic affect.  He found that the plaintiff had an atraumatic back with tenderness in the left paraspinal musculature with no crepitus or spasm.  He was alert and oriented times three and had full motor strength, equal grip strength, intact sensation and normal reflexes.  A head CT scan was negative. X-rays showed fusion of C4-6 with bone graft in place, and that the screws for the anterior plate had backed out slightly with no indication of any vertebral instability.  Dr. Sobel noted that the plaintiff's symptoms "resolved spontaneously."  He diagnosed acute neck pain and

cervical fusion at C4-6 by history.  He recommended that the plaintiff follow up with Dr. Poletti, restricted him to light work and prescribed Vicodin (a narcotic) (Tr. 207-12).

On April 1, 2002, Dr. Fravel prescribed Bextra (an anti-inflammatory), OxyContin and Neurontin, instructing the plaintiff that he would not refill his OxyContin again (Tr. 232).

On April 8, 2002, the plaintiff returned to Dr. Poletti.  Dr. Poletti stated that he did not think the plaintiff's screw was totally backing out, that there was no halo effect around his hardware, and that he was swallowing normally.  He recommended pain management (Tr. 179).

On May 21, 2002, Dr. Poletti noted that the plaintiff's x-rays looked good and recommended observation (Tr. 178).

On June 24, 2002, the plaintiff saw Dr. Mark Netherton for pain management. Dr. Netherton diagnosed post-cervical fusion and prescribed OxyContin (Tr. 177).

On July 9, 2002, Dr. Fravel treated the plaintiff for multiple contusions following a fall with medications (Tr. 231).

On July 16, 2002, the plaintiff saw Dr. Maldonado for a medication check, at which he was alert, oriented, and coherent with clear speech, full range of affect, and occasional daytime anxiety (Tr. 265).

On August 19, 2002, the plaintiff presented to Dr. Netherton with complaints of neck pain.  Dr. Netherton found that the plaintiff had some decreased cervical spine range of motion, difficulty turning his head to the left and good grip strength.  He diagnosed post anterior cervical discectomy and fusion with cervical pain and prescribed OxyContin. He informed the plaintiff that he would not be seeing patients any longer, recommended that the plaintiff follow-up with Dr. Poletti, and told him that Dr. Poletti would not continue to write prolonged medications (Tr. 176).

13

On October 14, 2002, the plaintiff saw Dr. Maldonado for a medication check, at which time he was alert, oriented and coherent.  Dr. Maldonado prescribed Xanax (Tr. 265).

On October 15, 2002, the plaintiff saw Dr. Fravel, who found that he had anxious and jittery affect, resistance to motion of the joints, flat upper extremity reflexes, normal lower extremity reflexes and grossly intact strength.  He diagnosed chronic pain and prescribed Vicodin (Tr. 230)

On October 25, 2002, the plaintiff sought treatment from Dr. John Motto for pain management.  Dr. Motto diagnosed cervical radiculitis, facet joint syndrome, generalized myofascial pain syndrome, and status post cervical fusion.  He prescribed Tizanidine (a muscle relaxer), Methadone (a synthetic opioid), Gabitril (an anti-convulsant), and Bextra (Tr. 388-89).

On November 9, 2002, the plaintiff presented to the emergency room with complaints of neck and back pain, difficulty swallowing and headache.  He was treated with Demerol and Phenergan with complete relief of his pain.  The diagnoses were neck pain status-post cervical laminectomy and tension headache were diagnosed (Tr. 197-98, 201-02).

The plaintiff returned to the emergency room on November 16, 2002, complaining that he had neck pain and that he could feel his plate move in his throat.  A head CT scan was normal and neck x-rays showed some minimal lucency around his surgical screws.  Neck pain was diagnosed, Tylox (a narcotic) was prescribed, and the plaintiff was released (Tr. 204-05).

On November 22, 2002, Dr. Motto adjusted the plaintiff's medications (Tr. 386-87).

On December 5, 2002, the plaintiff went to the emergency room for complaints of left leg and arm pain.  He was treated with Valium and Morphine, after which

14

he felt much better.  Exacerbation of chronic neck pain and hair loss were diagnosed, and Tylox was prescribed (Tr. 193-95).  The plaintiff saw Dr. Motto the following day, at which time Dr. Motto adjusted his medications (Tr. 384-85).

On December 13, 2002, the plaintiff saw Dr. Fravel, who found he was agitated and fidgety and had a large patch of hair loss on the back of his head and apprehensive use of his left side.  He diagnosed multiple complaints with very nebulous symptoms and noted that it was "getting very hard to tell what is really [sic] and what is not" (Tr. 229).

On December 18, 2002, while waiting for a scheduled MRI, the plaintiff presented again to the emergency room with complaints of pain.  He reported that he had already used 30 Tylox prescribed 12 days previously.  Dr. Mearns "reluctantly" gave the plaintiff a shot of Morphine and Valium to assist him with his MRI experience.  He stated that his demeanor and communication methods suggested drug seeking was really the dominant issue in his life.  He diagnosed chronic pain, narcotic dependency, and status post cervical spine fracture with open reduction and internal fixation.  Dr. Mearns refused to prescribe narcotic medication (Tr. 171-72).

The cervical MRI on December 18, 2002, showed post-surgical changes related to fusion and fixation and thickening of the ligamentum flavum on the right at C5-6 (Tr. 173-74, 191-92, 260).

On December 30, 2002, the plaintiff saw Dr. Poletti with complaints of significant pain.  He requested that his plate be removed.  Dr. Poletti stated he did not think the plaintiff should have his plate removed, that his fusion mass was solid, and that he should undergo pain management (Tr. 175).

On January 3, 2003, Dr. Poletti completed a form for the plaintiff's private disability insurer in which he stated that the plaintiff could not perform any exertional work and was totally disabled (Tr. 381, 463).  He stated that the plaintiff could lift less than 10

15

pounds and bend, kneel, climb stairs and reach above shoulder level occasionally (Tr. 382, 464). He further stated that the plaintiff could do only sedentary activity (Tr. 383).

On January 4, 2003, the plaintiff obtained a refill of his Xanax from the emergency room (Tr. 187). On January 6, 2003, he contacted Dr. Maldonado, reporting that he had memory problems and that he took extra Xanax. Dr. Maldonado noted grossly intact reality testing and personality deficits. She told the plaintiff that she would not replace his Xanax (Tr. 262).

On January 9, 2003, Dr. Motto noted decreased functioning, positive neck tender points and normal gait. He prescribed Fentanyl patches (Tr. 379-80).

On February 3, 2003, Dr. Maldonado found that the plaintiff was alert and coherent with clear sensorium and prescribed Xanax (Tr. 261). That same day, Dr. Motto found that the plaintiff's level of functioning was stable and that he had positive neck tender points and normal gait. He continued the plaintiff's Fentanyl (Tr. 377-78).

On February 18, 2003, Dr. Poletti stated that the plaintiff was "totally and permanently disabled." He stated that the plaintiff was on heavy narcotics and unable to sit in a chair for periods of time (Tr. 223, 376).

On March 3, 2003, the plaintiff complained to Dr. Motto of bilateral thigh and neck pain. Dr. Motto adjusted his medications (Tr. 374-75).

On March 31, 2003, he returned to Dr. Motto with neck, jaw and head pain. Dr. Motto continued his medications (Tr. 372-73).

On April 3, 2003, Dr. Maldonado noted that the plaintiff was alert and coherent and had a clear sensorium. She continued his medications (Tr. 261, 267, 272).

On April 28, 2003, Dr. Motto diagnosed cervical radiculitis, status post cervical fusion, complex regional pain syndrome and facet joint syndrome. Again, he adjusted the plaintiff's medications (Tr. 370-71).

16

On April 29, 2003, the plaintiff saw Dr. Fravel, requesting a cortisone shot between his shoulder blades after he hurt his back mowing the lawn. Dr. Fravel noted that the plaintiff's hand was a little blue, with very strong pulses, intact strength, and tenderness to the touch. He also found neck and trapezius tenderness. He diagnosed back pain and recommended follow-up with Dr. Chapple for reflex sympathetic dystrophy (Tr. 229).

On May 5, 2003, the plaintiff underwent a nerve conduction study which was abnormal and showed left ulnar nerve conduction slowing related to reflex sympathetic dystrophy in the left upper extremity (Tr. 244-47).

During May 2003, Drs. Chapple and Motto both continued to treat the plaintiff's neck, jaw and hand pain with medications and several left stellate ganglion block injections (Tr. 357-69).

During June 2003, Drs. Chapple and Motto again treated the plaintiff for hand and neck pain with medications and several left stellate ganglion block injections (Tr. 346-56).

The plaintiff was hospitalized on July 11, 2003, for increased confusion, talking to himself and inability to care for himself. Dr. Aziz Mohiuddin noted that the plaintiff might have relapsed into cocaine abuse, with symptoms of depression, hopelessness and suicidal ideation. Physical examination revealed a closed-head injury by history and complaints of neck and left arm pain. Dr. Mohiuddin treated the plaintiff with Zyprexa (an anti-psychotic), after which his mental status improved and he became better with memory and concentration. On July 24, 2003, Dr. Mohiuddin found that the plaintiff had reached the maximum benefit of inpatient treatment and was no longer exhibiting bizarre behavior or suicidal ideation. He diagnosed psychotic disorder, bipolar disorder, opiate dependence and cocaine abuse. He prescribed Zyprexa, Xanax, Gabitril and Duragesic patches (Tr. 274-77).

17

On July 28, 2003, the plaintiff presented to Lexington County Community Mental Health Center for treatment of depression and anxiety.  It was noted that he was well-groomed and cooperative with labile affect, irritable mood, normal speech, tangential thoughts, loose associations and hallucinations.  He could spell "world" backwards and perform serial sevens.  Diagnoses included psychosis not otherwise specified, dementia due to head injury, rule out PTSD, and alcohol dependence (Tr. 324-29).  That same day, Dr. Chapple adjusted the plaintiff's pain medications (Tr. 343-44).

On August 1, 2003, Dr. Robert Kukla, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform medium work that did not require more than occasional climbing of ladders, ropes or scaffolds, or more than frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling (Tr. 311-18).

On August 18, 2003, the plaintiff saw Dr. Kathy Lundvall for medication management.  Dr. Lundvall found that he was alert with no suicidal or homicidal ideation and had anxious affect and poor memory.  She diagnosed psychosis, not otherwise specified, and dementia.  She adjusted the plaintiff's Xanax and Zyprexa (Tr. 320).

On August  25, 2003, Dr. Motto adjusted the plaintiff's pain medications (Tr. 341-42).

On September 16, 2003, Dr. Anthony Carraway, a psychiatrist, examined the plaintiff at the request of the Commissioner.  Dr. Carraway noted that this was "an extremely difficult and frustrating interview to complete."  The plaintiff stated that he was "not a crack addict" and there were "times when [he had] helped the police to arrest drug addicts and [had to] put [crack] in [his] mouth to test it to be sure it [was] okay."  Dr. Carraway stated that the plaintiff would absolutely not admit to abuse issues regarding illicit drugs or prescribed medications. The plaintiff reported that his daily activities included working in the yard, walking his mother's dogs, and doing "little projects."  Dr. Carraway found that the

18

plaintiff looked medicated, constantly argued with his mother, and was quite accusatory. He found that he had normal eye contact, normal speech, logical and goal directed thoughts (except with talking about documentation regarding substance use history), no hallucinations, no delusions, no suicidal ideation, irritable affect, depressed mood, and orientation to the month and year. He noted that the plaintiff displayed mild impairment of short term memory, mild impairment of immediate memory, and intact attention and concentration. He diagnosed mood disorder due to chronic pain, opioid dependence, cocaine dependence, and a personality disorder and assigned a GAF score of 60.[5] He noted that the plaintiff's prognosis was guarded (Tr. 286-90).

On September 25, 2003, the plaintiff saw Dr. Motto again for neck pain. Dr. Motto adjusted his medications and prescribed a neck brace (Tr. 339-40).

On October 3, 2003, Dr. W. Pearce McCall, a State agency psychologist, reviewed the medical evidence and found that the plaintiff had a mood disorder and polysubstance dependence which caused moderate limitations in his activities of daily living and maintaining concentration, marked limitations on social functioning, and no episodes of decompensation (Tr. 293-306). He stated that, in the absence of drug and alcohol addiction, the plaintiff could perform simple tasks (Tr. 307-10).

On October 8, 2003, the plaintiff saw Dr. Lundvall, who found that he was alert with no suicidal/homicidal ideation, anxious affect and no hallucinations. She adjusted his medications (Tr. 319).

On October 23, 2003, the plaintiff saw Dr. Motto, who diagnosed occipital neuralgia, complex regional pain syndrome in the left upper extremity, cervical radiculitis, status-post surgical fusion, cervical facet joint syndrome, and closed head injury by history.

---

[5]A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*, *see supra*, note 5.

He recommended a right occipital nerve block injection and prescribed medications (Tr. 337-38).

On November 19, 2003, the plaintiff saw Dr. Lundvall for medication management.  She found he was alert with slightly anxious affect, no suicidal/homicidal ideation, and no hallucinations.  She adjusted his medications (Tr. 319).

From November 2003 to January 2004, Dr. Motto treated the plaintiff's complaints of hand, finger and neck pain with medications (Tr. 331-36).

On January 21, 2004, Dr. Lundvall saw the plaintiff for medication management.  She found that he was alert with anxious affect, mild hand tremors, and no suicidal/homicidal ideation or hallucinations.  She adjusted his medications (Tr. 321).

From February 10-18, 2004, the plaintiff sought treatment from the Veterans Administration for complaints of anorexia, isolation, nightmares and flashbacks related to atrocities he said he witnessed "'80-'84" in Cambodia, Thailand and Vietnam as a Marine (Tr. 427).  He denied substance abuse.  PTSD was diagnosed (Tr. 431-33).

On February 18, 2004, the plaintiff saw Dr. Kevin Etter for evaluation.  He reported that he could not remember the last time he used alcohol and drugs.  Dr. Etter noted that the PTSD diagnosis at intake triage was not realistic.  Dr. Etter found that the plaintiff was alert and fully oriented, but only through association and calculation.  He found that the plaintiff was neatly dressed and well groomed with elaborate, logical, deliberative and goal directed speech.  He found that the plaintiff had no apparent disorders of thought content or form, hallucinations, or suicidal/homicidal ideation.  He found that the plaintiff was somewhat restless but overall had normal motor functioning.  He diagnosed anxiety due to head and other injuries and prescribed medications (Tr. 425-26).

On March 3, 2004, Lisa Klohn, Ph.D., a State agency psychologist, reviewed the medical evidence and found that the plaintiff had a schizophrenic, paranoid or other psychotic disorder, a depressive disorder, an anxiety disorder, a personality disorder and

a substance addiction disorder. She found that the plaintiff had moderate limitations on his activities of daily living and social functioning, marked limitations on his ability to maintain concentration, persistence and pace, and one or two episodes of decompensation (Tr. 444-57). She found moderate limitations on the plaintiff's abilities to understand, remember, and carry out detailed instructions, maintain attention, perform activities within a schedule, complete a normal work-week, interact with the general public, accept instructions and criticism and respond appropriately to changes in a work setting. She stated, however, that if the plaintiff's substance dependence was completely in remission, he could perform unskilled work in a low-stress environment (Tr. 458-62).

On March 10, 2004, Dr. Joyce Lewis, a State agency physician, reviewed the medical evidence and found that the plaintiff could perform medium work that required no more than occasional climbing of ladders, ropes and scaffolds, and no more than frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling (Tr. 436-43).

### Other Evidence and Hearing Testimony

In an undated questionnaire, the plaintiff stated that he witnessed several atrocities while serving as a U.S. Marine in Thailand between 1980 and 1984 (Tr. 114-17).

At the hearing, the plaintiff testified that he did not drive (Tr. 470-71). He said that he served in the U.S. Marine Corps for five years, during which time he witnessed several atrocities, resulting in PTSD (Tr. 471-72). He testified that he stopped working after he experienced a "jolt" running from his foot through his spine and to his head, so much so that he lost a patch of hair within three days (Tr. 473-74). He said that he underwent cervical discectomy surgery (Tr. 474). He testified that his worst problems were mental, including forgetfulness (Tr. 474-75). He testified that he had not used cocaine since May 2000 (Tr. 477). He also testified that he had difficulty walking due to "jolts" he experienced

21

all of the time (Tr. 478-79).  He stated that he had nightmares (Tr. 481).  He also stated that he spent his time watching television, walking in his back yard, going to the bookstore, stretching, cleaning up his parents' back yard, and putting his laundry in the washer (Tr. 481-82).  He testified that he served in the U.S. Marine Corps between 1979 and 1981 (Tr. 485).  He also testified that he had difficulty sitting, due to neck and back discomfort, and focusing (Tr. 487-89).

Susan Shunkwiler, the plaintiff's mother, testified that he stopped working due to pain (Tr. 494).  She stated that the plaintiff behaved erratically (Tr. 496).  She testified that he collected, washed and folded his clothes, but that she put them in the drier for him (Tr. 497).  She also testified that he mowed the lawn and used a weed whacker (Tr. 497).

## **ANALYSIS**

The plaintiff alleges disability since May 5, 2001, due to a head injury, post traumatic stress disorder, memory problems, cervical disorder, neck pain, and difficulty walking.  The ALJ determined that the plaintiff's degenerative disc disease was a severe impairment and that the plaintiff's depression was a severe impairment only when combined with his substance abuse (Tr. 23).  The ALJ further found that the plaintiff was disabled due to his substance abuse and subsequent severe depression due to this abuse.  However, the ALJ determined that when the plaintiff abstains from substance abuse he has the residual functional capacity to perform light work.  Accordingly, the ALJ found that without consideration of the plaintiff's substance abuse, he could return to his past relevant work as a general hardware salesperson and as an automobile salesperson.  The plaintiff alleges that the ALJ erred by (1) failing to properly consider the opinion of treating physician Dr. Poletti; (2) failing to properly evaluate his credibility; and (3) failing to properly evaluate the materiality of his substance addiction.

22

***Treating Physician***

        The plaintiff first argues that the ALJ improperly rejected the opinion of his treating physician, Dr. Poletti.  On January 3, 2003, Dr. Poletti completed a form for the plaintiff's private disability insurer, stating that the plaintiff could not perform any exertional work and was totally disabled (Tr. 381, 463).  He stated that the plaintiff could lift only less than 10 pounds and bend, kneel, climb stairs, and reach above the shoulders occasionally (Tr. 382, 464).  He also stated that the plaintiff could do only sedentary activity (Tr. 383).  On February 3, 2003, Dr. Poletti stated that the plaintiff was "totally and permanently disabled" and unable to sit in a straight back chair for periods of time (Tr. 223, 376).

        In his decision, the ALJ noted that the opinion of a treating physician is entitled to great weight unless there is persuasive contradictory evidence.  The ALJ went on to find as follows:

> In this instance, Dr. Poletti's statements are not substantiated by his treatment notes or by the overall record.  Instead, his conclusion is based on the unquestioning acceptance of the claimant's subjective complaints. As discussed throughout this decision, the claimant is less than forthright, and oftentimes completely denies his substance abuse problems, despite overwhelming evidence to the contrary.  Also, treatment notes from various providers indicate that the claimant has exaggerated his symptoms at times, has reported symptoms which are inconsistent with clinical findings and has a higher level of functioning when distracted.  For these reasons, I give little to no weight to Dr. Poletti's statement that the claimant is disabled.

(Tr. 20).

        The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the

Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

The ALJ's properly evaluated the opinions of Dr. Poletti. The ALJ found that Dr. Poletti's statements were not substantiated by his own treatment notes (Tr. 20). Following the plaintiff's anterior cervical discectomy surgery in August 2001, Dr. Poletti noted that the plaintiff was ambulating well and x-rays showed good position of the interbody bone and plate (Tr. 183). In September 2001, he found that the plaintiff was

24

doing reasonably well, ambulating better, and was improving (Tr. 182).  In October 2001, he found that the plaintiff was "doing remarkably well" and that his fusion was solid (Tr. 181).  In December 2001, Dr. Poletti noted that x-rays showed a "very good" fusion mass at C5-6, and consolidated fusion at C6-7 and C3-4 (Tr. 180).  Following x-rays that showed that a screw was slightly backing out of the plaintiff's anterior plate, Dr. Poletti stated that he did not think that the screw was totally backing out, that there was no halo effect around his hardware, that he was swallowing normally, and that he should undergo pain management (Tr. 179).  In May 2002, Dr. Poletti stated that the plaintiff's x-rays "looked good" (Tr. 178).  Six months later when the plaintiff requested that his plate be removed, Dr. Poletti stated that the plate should not be removed, that his fusion mass was solid, and that he should undergo pain management (Tr. 175).

        As the ALJ also found, Dr. Poletti's opinions were not supported by other evidence in the overall record, particularly overwhelming evidence that the plaintiff was less than forthright with his medical sources and exaggerated his symptoms (Tr. 20).  In May 2000, Dr. Mearns noted that the plaintiff's affect was inconsistent with his physical complaints, and his overall demeanor suggested secondary gain.  He noted that when he was not asking the plaintiff various testing activities as part of his examination, he used all extremities without any evidence of weakness.  He also noted that, although the plaintiff tried to appear weak and prone to falling, he used his muscle groups extensively to keep himself upright.  He also used all of his muscle groups when he left the hospital, although attempting to appear as though he would fall or pass out (Tr. 219-22).  In September 2000, Dr. Westerkam noted that, while the plaintiff could not perform cervical flexion during formal testing, he performed cervical flexion during completion of paperwork.  Dr. Westerkam concluded that the plaintiff gave inconsistent effort and could perform light duty work (Tr. 248-53).  In April 2001, Dr. Fravel found that the plaintiff was "overstating his symptomology" (Tr. 235).

In June 2001, when the plaintiff presented to the emergency room claiming he had been hit by a car, Dr. Donato noted that, while the plaintiff refused to undergo range of motion testing, he appeared to have quite normal motor function while he was on the stretcher.  Dr. Donato found that there was no objective evidence to verify that the plaintiff was hit by a car.  Dr. Donato stated that, upon examination, the plaintiff jumped forward and called out in pain during palpation in certain areas, but when distracted and palpated with equal force in those same areas, he had absolutely no discomfort.  He also stated that, while the plaintiff would not move his neck during formal testing, he moved it around freely and with no restriction at other times.  Dr. Donato found that the plaintiff's presentation was completely related to secondary gain or malingering (Tr. 213-14).

When Dr. Fravel saw the plaintiff the following month, he described the plaintiff as "over animated."  He noted that, while the plaintiff appeared weak and ready to fall when he got up from a seated position, when distracted he sat back down easily using the muscles in his legs (Tr. 234).  When the plaintiff was hospitalized in February 2002, Dr. Walkup noted that he was contacted by police, who said that the plaintiff had pending charges of kidnaping and assault and battery with intent to kill.  Dr. Walkup stated that, while the plaintiff denied coming to the hospital to escape the charges, he was "somewhat suspicious" of this (Tr. 149-57, 162-64).

In March 2002, Dr. Sobel found that the plaintiff had no paraspinal muscle crepitus or spasm and had full motor strength, equal grip strength, intact sensation and normal reflexes.  A head CT scan was negative, and x-rays showed C4-6 fusion with bone graft in place and screws backing out of the anterior plate only "slightly" with no indication of vertebral instability.  Dr. Sobel stated that the plaintiff could perform light work (Tr. 207-12).  In December 2002, Dr. Fravel diagnosed "multiple complaints with very nebulous symptoms" and noted that it was "getting very hard to tell what is really [sic] and what is not" (Tr. 229).  That same month, December 2002, Dr. Mearns noted that the plaintiff had used

26

30 Tylox in 12 days and described him as a drug seeker (Tr. 171-72). In September 2003, Dr. Carraway noted that the plaintiff denied being a crack addict, instead stating that he sometimes assisted police in arresting drug addicts, which required that he taste the crack to make sure it was okay. Despite evidence to the contrary, he absolutely would not admit to abusing illicit drugs or prescription medications (Tr. 286-90).

The plaintiff argues that, even if Dr. Poletti's statements were not entitled to controlling weight, they were still entitled to some deference, and the ALJ failed to determine what weight to accord those opinions considering the factors listed in 20 C.F.R. § 404.1527(d) (pl. brief 7). However, the ALJ specifically stated in his decision that he considered all medical opinions in accordance with 20 C.F.R. § 404.1527 (Tr. 22). In evaluating Dr. Poletti's opinions and determining that they were entitled to "little to no weight," the ALJ specifically considered that Dr. Poletti was a treating physician (Tr. 20). He also considered the supportability of Dr. Poletti's opinions and their consistency with the overall record (i.e., "Dr. Poletti's statements are not substantiated by his treatment notes or the overall record.") (Tr. 20). The ALJ considered other factors, including the plaintiff's being less than forthright with his medical sources, drug seeking behavior, exaggeration of symptoms and malingering. Based upon the foregoing, the ALJ properly considered the opinions of Dr. Poletti, and substantial evidence supports his finding.

### Credibility

The plaintiff next argues that the ALJ erred in finding that the plaintiff's allegations concerning the nature and severity of his impairments were "not totally credible" (Tr. 24). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as

27

long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

In finding the plaintiff's allegations "not totally credible" (Tr. 24), the ALJ considered the plaintiff's subjective complaints and found that his subjective complaints were inconsistent with the objective medical evidence (Tr. 22). The findings of Drs. Mearns, Westerkam, Fravel, Chapple, Donato, Poletti, Sobel, Netherton and Motto, as well as

28

several imaging studies in the record, did not indicate the degree of physical symptomology that the plaintiff alleged (Tr. 175 – his fusion mass was solid and Dr. Poletti found his plate should not be removed; Tr. 178-79 – his plate screws were not totally backing out, he had no halo effect around his hardware, and he was swallowing normally; Tr. 180 – x-rays showed that he had a "very good" fusion mass at C5-6 and consolidated fusion at C6-7 and C3-4; Tr. 182 – he was doing reasonably well, ambulating better, and improving; Tr. 183 – he ambulated well and x-rays showed good position of the interbody bone and plate; Tr. 204-05 – CT scan was normal and neck x-rays showed some "minimal lucency" around his surgical screws; Tr. 207-12 – he was well developed, well-nourished, had "mildly histrionic" affect, no paraspinal crepitus or spasms, full motor strength, equal grip strength, intact sensation, normal reflexes, a negative head CT scan, and x-rays showing C4-6 fusion in place with "slight" backing out of screws and no vertebral instability; Tr. 213-14 – he appeared to have quite normal motor function and, when not performing normal testing, moved his neck around completely freely; Tr. 219-22 – he moved very easily without weakness; Tr. 230 – he had grossly intact strength; Tr. 248 – he had a five percent whole person impairment rating and could do light work; Tr. 249-53 – he demonstrated cervical flexion while distracted, gave inconsistent effort and could perform light work; Tr. 269 – he was "doing remarkably well" and had a solid fusion; Tr. 398-99 – he had positive neck tender points and normal gait).

Likewise, the findings of Drs. Maldonado, Walkup, Lundvall, Carraway and Etter did not indicate the degree of mental symptomology that the plaintiff alleged (Tr. 123-24 – he had a GAF score of 95, indicating "superior functioning"; Tr. 149-57, 162-64 – after treatment during his February 2002 hospitalization, his mood stabilized, his suicidal ideation resolved, he was no longer manic, and he was pleasant and cooperative; Tr. 261 – he was alert and coherent with clear sensorium; Tr. 262 – he had "grossly intact" reality testing; Tr. 265 – he was alert, oriented and coherent; Tr. 274-77 – during hospitalization in July 2003,

29

his mental status improved and he did better with memory and concentration; Tr. 286-90 – he had normal eye contact, normal speech, logical and goal directed thoughts, irritable affect, depressed mood, orientation to month and year, mild memory impairment, intact attention and concentration, and a GAF of 60, indicating only moderate symptoms, and no hallucinations, delusions or suicidal ideation; Tr. 319 – he was alert with "slightly" anxious affect and no suicidal/homicidal ideation or hallucinations; Tr. 320 – he was alert with no suicidal/homicidal ideation, anxious affect and poor memory; Tr. 425-26 – he was alert and fully oriented (through association and calculation), neatly dressed and well-groomed with elaborate, logical, deliberative and goal directed speech and no apparent disorders of thought content or form, hallucinations or suicidal/homicidal ideation, "somewhat" restless, but overall had normal motor functioning).

Further, the ALJ noted that the evidence included "numerous references from the plaintiff's treating doctors that he has exaggerated his symptoms, that his reported symptoms are inconsistent with clinical findings, that he may be malingering, and that he is at times drug seeking" (Tr. 22). In May 2000, Dr. Mearns noted that the plaintiff's affect was inconsistent with his physical complaints, and his demeanor suggested secondary gain. He noted the plaintiff's preoccupation with making sure that his lawyers were aware of his circumstances. He also noted that the plaintiff did not cooperate with the exam but moved very easily and used all extremities without evidence of weakness when alone. While the plaintiff appeared to be weak and prone to falling, he used his muscle groups extensively to keep himself upright (Tr. 219-22). In September 2000, Dr. Westerkam noted that the plaintiff gave inconsistent effort during testing and, while he was unable to perform cervical flexion during formal testing, he demonstrated continued cervical flexion at other times (Tr. 249-53).

In June 2001, Dr. Donato noted that, while the plaintiff alleged being hit by a car, he had no soft tissue changes, ecchymosis, soft tissue swelling or abrasions. He

30

further noted that, on examination, the plaintiff jumped forward and called out in pain during palpation to certain areas along the scapular region, and when distracted and palpated with equal force to those areas, had no discomfort at all.  He also noted that the plaintiff would not move his neck on formal testing, but moved it completely freely at other times.  He stated that the plaintiff's presentation was completely related to secondary gain (Tr. 213-14).  The following month, Dr. Fravel described the plaintiff as "over animated" and noted that he stood up and appeared shaky with careful gait, looking like he was weak and ready to fall, but when distracted, sat back down easily (Tr. 234).  The ALJ properly considered this evidence in evaluating the plaintiff's credibility (Tr. 19-22).

The evidence also showed significant drug-seeking behavior by the plaintiff. In December 2002, he reported to Dr. Mearns that he used 30 Tylox in 12 days.  Dr. Mearns stated that his demeanor and communication methods suggested that drug seeking was really the dominant issue in his life.  He "reluctantly" gave the plaintiff a shot of Morphine and Valium and refused to prescribe any narcotic medications (Tr. 171-72). There was also evidence that the plaintiff was non-compliant with treatment.  In February 2002, Dr. Walkup noted that the plaintiff was unwilling to undergo opiate detoxification and resisted consenting to the release of medical records from other physicians (Tr. 149-57, 162-64).  The evidence further showed that, when the plaintiff underwent treatment and took medications as prescribed, his symptoms improved.  For example, after he was treated with Zyprexa during his psychiatric hospitalization in July 2003, his mental status improved, his memory and concentration were better, and he no longer exhibited bizarre behavior or suicidal ideation (Tr. 274-77).  "If a symptom can be reasonably controlled by medication or treatment, it is not disabling."  *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

The plaintiff's daily activities also undermined his subjective complaints that his symptoms were so severe as to be disabling.  In April 2003, he asked Dr. Fravel for a Cortisone shot because his shoulder blades hurt from mowing the lawn (Tr. 229).  He told

Dr. Carraway that he worked in the yard, walked his mother's dog, and did "little projects" (Tr. 286-90). At the hearing, he testified that he watched television, went to the bookstore, and put laundry in the washer (Tr. 481-82). His mother testified that he folded his clothes (Tr. 497). While not alone determinative, the ALJ considered evidence of the plaintiff's daily activities with the evidence of record as a whole, which supported his conclusion that the plaintiff's limitations were not as severe as he alleged (Tr. 21). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she attended church, read, watched television, cleaned house, washed clothes, visited relatives, fed pets, cooked, managed finances, and performed stretching exercises).

Several notable inconsistencies further reduced the plaintiff's credibility. While he was in the hospital in February 2002, the police contacted Dr. Walkup with information that the plaintiff had pending charges of kidnaping and assault and battery with intent to kill. While the plaintiff denied that he came to the hospital to escape these charges, Dr. Walkup was "somewhat suspicious" of this (Tr. 149-57, 162-64). When confronted with evidence of drug addiction and drug seeking behavior by Dr. Carraway, the plaintiff would "absolutely not admit" to abuse of illicit drugs or prescribed medications (Tr. 286-90). The plaintiff told Dr. Etter in February 2004 that he could not remember the last time he used drugs (Tr. 425-26), yet the record showed that he was hospitalized for cocaine abuse less than a year before (Tr. 274-77). Additionally, while the plaintiff testified that he served as a Marine in Thailand from 1980 to 1984 (Tr. 114-17), he later testified that he served as a Marine from 1979 to 1981 (Tr. 485). The ALJ properly considered these inconsistencies in evaluating the plaintiff's credibility (Tr. 20-22).

Based upon the foregoing, the ALJ properly analyzed the plaintiff's credibility, and his finding that the plaintiff's allegations concerning the nature and severity of his impairments were "not totally credible" is supported by substantial evidence.

32

*Substance Addiction*

The plaintiff further alleges that the ALJ improperly evaluated the materiality of his substance abuse.  The law provides that a person will "not be considered to be disabled . . .  if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535(a) (precludes an award of disability benefits if alcohol or drug abuse was "a contributing factor material to the Commissioner's determination that the individual is disabled").  The ALJ makes this determination by first evaluating whether the claimant is disabled under the Act. If the ALJ finds that the claimant is not disabled, then the claimant is not entitled to benefits and there is no need to proceed with the analysis of determining whether the drug or alcohol addiction is a contributing factor material to the determination of disability.  If the claimant is disabled under the Act and there is medical evidence of drug or alcohol addiction, then the ALJ must determine whether the claimant would still be disabled if he stopped using alcohol or drugs.  If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability.   If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied. 20 C.F.R. § 404.1535(a).

The ALJ noted in his decision:  "An additional issue is whether evidence of drug and/or alcohol abuse is present in this case, and if so, whether the claimant's benefits could be affected by amendments to the Social Security Act which are contained in Public Law 104-121" (Tr. 17).  He specifically found that the plaintiff had "severe" degenerative disc disease and depression (Tr. 18, 23).  Considering the plaintiff's severe impairments, the ALJ found that he did not have an impairment that met or equaled a Listing (Tr. 18-19, 23).  The ALJ found that, with the effects of his drug addiction, the plaintiff had moderate restrictions on his activities of daily living, moderate difficulties in maintaining social

33

functioning, marked difficulties in maintaining concentration, persistence and pace, and repeated episodes of decompensation (Tr. 22-23). The ALJ found that, considering his drug addiction, the plaintiff was "unable to do unskilled work on a sustained basis due to his mental symptoms" (Tr. 22, 24). However, factoring out the plaintiff's drug addiction, the ALJ found that his depression was not severe (Tr. 18-19). He found that absent drug addiction, the plaintiff had a residual functional capacity for light work and no significant mental limitations (Tr. 22-24), a finding which was supported by the record, as discussed above. With this residual functional capacity, the ALJ found that the plaintiff was not precluded from performing his past relevant semi-skilled light work as a general hardware salesperson and skilled light work as an automobile salesperson (Tr. 23-24).

Based upon the foregoing, this court finds that the ALJ properly concluded that the plaintiff's drug addiction was material to his determination of disability (Tr. 17, 19, 23-24).

## CONCLUSION

This court has considered the entire record and finds that the ALJ's decision that the plaintiff is not disabled is based upon substantial evidence. Based upon the foregoing, this court recommends the decision of the Commissioner be affirmed.

s/William M. Catoe
United States Magistrate Judge

August 27, 2008

Greenville, South Carolina

34